UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>BRADEN J. KARONY, et al.,<br><br>        Defendants. | Crim. Case No. 23-cr-433-EK |

**BRADEN J. KARONY'S OPPOSITION TO THE GOVERNMENT'S MOTION TO EXCLUDE KARONY'S EXPERT WITNESS**

Nicholas Smith
1123 Broadway, Ste. 909
New York, NY 10010
917-902-3869

*Counsel for Braden J. Karony*

**Table of Contents**

Professor Mizrach's opinions ................................................................................................ 1

Argument .................................................................................................................................. 3

    I.    Legal standard for expert testimony ................................................................... 4

    II.    The government does not even engage with Mizrach's opinions, which rest on sufficient data and reliable methodology ............................................. 4

    III.    Mizrach does not "import civil fraud standards" into his opinions ............... 9

    IV.    Mizrach's testimony is not a "vehicle" for "self-serving hearsay" ............... 12

    V.    Mizrach's opinions are based not on the indictment, but on evidence ....... 13

Conclusion .............................................................................................................................. 14

Braden J. Karony intends to offer the expert testimony of Bruce Mizrach, Ph.D., a professor of economics; adviser to Federal Reserve Banks, the U.S. Department of Treasury, and the Securities and Exchange Commission; and scholar in the area of digital asset markets. The SEC has itself offered Mizrach's expert testimony in cases like this one concerning alleged violations of the securities laws in cryptocurrency markets. The government has moved the Court to exclude the testimony of its former expert on four grounds. Gov't Mot., ECF No. 79, p. 1. None has merit.

In the first place, the government cannot decide on the relief it seeks, variously asking the Court to exclude Mizrach's opinions "in their entirety" (Gov't Mot., p. 1) or some unspecified "majority" of them. *Id.*, p. 4. In any event, the government's motion justifies neither outcome, as it simply hangs expert-witness buzzwords on incidental lines in Karony's expert disclosure rather than addressing or even describing the substance of Mizrach's opinions informed by blockchain data, SafeMoon trading information, and the professor's experience and knowledge. To the extent the government's arguments are substantive, each has been rejected in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015). There, the securities-fraud defendant's conviction was vacated because the district court improperly excluded expert testimony on the question of materiality. *Id.* at 181-84. As a legal matter, that expert's opinion was indistinguishable from Mizrach's.

## I. Professor Mizrach's opinions

The government's motion does not describe the expert testimony it seeks to exclude, so Karony will provide a summary here. Professor Mizrach's opinion rests on three basic components.

First, Mizrach would offer technical and specialized background testimony concerning: (i) the purpose and function of a blockchain, including the Binance Smart Chain on which SafeMoon token was acquired; (ii) the SafeMoon token itself and the process by which users acquired and

1

traded it on decentralized and centralized exchanges; and (iii) digital-asset liquidity pools generally as well as the liquidity pools (LP) at issue, including testimony concerning the function of "locking" such a pool.  Mizrach Discl., ECF No. 78-2, pp. 2-8.  Karony does not understand the government to be objecting to this aspect of Mizrach's testimony which goes to the heart of the charges.

Second, Mizrach would testify about where and how SafeMoon users could gain access to public information on the blockchain about the SafeMoon LP, including details about when the SafeMoon developers locked the LP and when they withdrew tokens from it.  Mizrach Discl., § 1.6.2 (LP locking transactions); § 1.6.3 (LP withdrawals).  Mizrach would testify about the websites where users could acquire this information and the frequency and speed with which it was published following locking and withdrawal actions by the developers.  *Id.*  He would testify about the market's responses to these locking and withdrawal actions, as reflected in the market price of SafeMoon token.  This testimony is based on, among other things, data acquired from the Binance Smart Chain through a publicly available blockchain explorer.  *See* BscScan, the Binance Smart Chain Explorer, available at: https://bscscan.com/.  *Id.*

Third, Professor Mizrach would testify about an event study he performed into SafeMoon prices as they stood on April 21, 2021.  Mizrach Discl., § 2 (Exh. 9).  This study examines the relationship between SafeMoon price over the course of that day and the developers' public disclosures concerning whether the LP was, in fact, fully "locked." *Id.*  This study is based on data reflecting SafeMoon swaps—acquired from the blockchain through the BscScan—and public statements made by the defendants on the Twitter platform and other social media platforms.  All of these data were and are available to SafeMoon users, as Mizrach explains.

Mizrach is a professor of economics at Rutgers University.  He is the founder and former editor-in-chief of *Studies in Nonlinear Dynamics and Econometrics*, a journal devoted to the impact

2

of nonlinear models on the macroeconomy and financial markets. His most recent work focuses on the market microstructure of electronic limit order markets in equities, fixed income, crude oil and digital assets. He has provided policy advice to the Federal Reserve Banks of New York and St. Louis, the U.S. Department of Treasury Office of Financial Research, and the Financial Regulatory Authority. Mizrach Discl., p. 1. Professor Mizrach has served as an expert witness in nine cases, most recently as an expert for the SEC in the cryptocurrency securities case *SEC v. Terraform Labs Pte. Ltd.*, 23-cv-1346-JSR (S.D.N.Y. 2023).

**Argument**

**I.    Legal standard for expert testimony**

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In securities fraud cases—both civil and criminal—courts routinely permit expert testimony on such technical subjects as how securities markets function, the types of information with which investors evaluate and trade securities, trading history in those securities, and other industry customs and practices. Indeed, courts regularly do so even when the expert in question is far less experienced than a preeminent scholar in the field whose opinions have been offered by the

3

government itself in securities cases. *See, e.g.*, *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015) (finding no abuse of discretion in admission of expert testimony regarding coin valuation even though "it is possible that [the expert's] methods are not entirely replicable because they are based in part on his personal experience as a coin dealer"); *United States v. Avasso*, 23 F.App'x 33, 35 (2d Cir. 2001) (summary order) (affirming admission of expert testimony that certain information "is a material fact in a purchaser's decision which must be disclosed under NASD rules"); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2003 U.S. Dist. LEXIS 4650, 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (admitting securities industry expert's testimony "as to what ordinary broker activity entails and as to the customs and practices of the industry"); *SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608, 2002 U.S. Dist. LEXIS 19701, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (admitting expert's testimony that "certain trading patterns would raise 'red flags'" based on expert's "knowledge of typical trading activity and the types of trading patterns that an experienced trader would recognize as irregular, and as such, are supported by his 30 years of experience in the securities industry").[1]

**II.     The government does not even engage with Mizrach's opinions, which rest on sufficient data and reliable methodology; their exclusion would be prejudicial error**

The government objects that it sees "no discernible evidence, data, or information on which Mizrach has based his opinions concerning the reasonable SFM investor." Gov't Mot., p. 6. It offers a bulleted list comprising four sentences and sentence fragments cherry-picked from Mizrach's 15-page disclosure, characterizing them as *ipse dixit*. *Id.*, p. 5. Yet the government fails even to describe the thrust of Mizrach's opinions, and the professor's disclosure carefully elucidates the body of evidence and data on which those opinions are based and his methodology.

---

[1] The government's memorandum contains a section outlining legal standards applicable to Rule 403. Gov't Mot., p. 3. However, the government does not appear to make any argument under that evidentiary rule.

4

As explained, beyond providing helpful background information of a technical nature to the fact finder, Mizrach will offer opinions and related specialized knowledge concerning (1) where and how SafeMoon users could gain public access to information about the SafeMoon LP on the blockchain, including details about when the SafeMoon developers locked the LP and when they withdrew tokens from it; and (2) an event study Mizrach undertook examining the relationship between SafeMoon market price over the course of April 21, 2021 and the developers' public representations that day on the subject of whether the LP was, in fact, fully "locked."

Mizrach's opinions are relevant because the gravamen of the government's case is that Karony and the other defendants materially misled users by representing that the SafeMoon LP was "locked" when in fact the defendants withdrew tokens from the LP without informing the users. Ind., ¶¶ 25-26, 36-59.  That Mizrach's opinions are based on sufficient data and a reliable methodology can be seen on the face of the disclosure and its accompanying exhibits, demonstrating that the professor's views rest on such evidence as LP token holder data, LP locking transaction data, SafeMoon and Binance token price data spanning March 5, 2021 to at least April 21, 2021, the defendants' public statements in March and April 2021, and other evidence.[2] Mizrach Discl., pp. 3-12.  No "sparse set of materials" (Gov't Mot., p. 7), this amounts to a large corpus of evidence comprising dozens of .csv files that Mizrach collected, distilled and analyzed,

---

[2] The government asserts that "there is no evidence that Karony has presented Mizrach with the '*total mix*' of information actually before SFM investors, which includes not only tweets and videos, but also social media forums over which the defendants made numerous oral representations to SFM investors concerning, among other things, SFM, the liquidity pool, and the developers' access to and use of tokens from the pool." Gov't Mot., pp. 6-7 (emphasis added).  But (1) the government confuses weight and admissibility: there is no rule or case holding that, to offer admissible testimony, an expert must take possession of every piece of information available to every investor, whether relevant to his opinion or not; and (2) Mizrach's disclosure makes clear that, to the extent the indictment relies on "information actually before SFM investors" and to the extent such information was produced in discovery, it was presented to him.  Mizrach Discl., pp. 3-15.

5

according to a methodology he carefully explicates. In the disclosure, Mizrach walks the reader through every step of his analysis and demonstrates how any user could and may well have done the same. *Id.* While his exposition is clear, Mizrach's analysis is still technical and specialized, as the world of blockchain data mining falls outside the ken of fact finders with no experience in this industry.

None of these opinions or sources of data is referenced in the government's motion. The government does not explain how these technical opinions concerning information available to every SafeMoon user would not assist the fact finder in his or her consideration of the question whether the defendants' alleged false representations were materially misleading to an objectively "reasonable investor." The government does not suggest that the data relied on by Mizrach are somehow unreliable, inaccurate or mistakenly analyzed. Thus, its motion must fail.[3]

The *Litvak* case shows that exclusion of Mizrach's testimony would yield a trial error warranting vacatur of any resulting conviction. Litvak was a broker-dealer at Jefferies & Company, where he sold residential mortgage-backed securities (RMBS) to public-private investment funds. He was charged with falsely representing to the investment funds the cost to Jefferies of acquiring the RMBS. At trial, Litvak sought to offer expert testimony "about the process investment managers use to evaluate a security, and the irrelevance of the broker-dealer's acquisition price to that process." *Litvak*, 808 F.3d at 181. The defendant argued that this was "directly probative of whether [his] misstatements would have been material to a reasonable investor." *Id.* The expert's opinion was that, in his experience, "such statements from sell-side sales representatives or traders are generally biased, often misleading . . ." *Id.* The government objected that this testimony would invade the province of the fact finder on the materiality issue

---

[3] The government may not raise new arguments in its reply brief, but if it attempts to do so, Karony reserves the right to respond.

6

and, agreeing, the district court excluded it. *Id.*

The Second Circuit held that such exclusion was an error requiring vacatur of Litvak's securities fraud conviction. Its reasoning is worth quoting at length:

> Aside from [the expert's] testimony in respect of the nature of the RMBS market, there are few ways in which Litvak could put forth evidence to rebut the alleged victims' testimony that Litvak's misstatements were important to them, or otherwise counter the government's argument that a reasonable investor would have found Litvak's statements material. The District Court's "relevance" concerns were unfounded, *cf. United States v. Avasso*, 23 F. App'x 33, 35 (2d Cir. 2001) (summary order) (affirming admission of expert testimony that certain information "is a material fact in a purchaser's decision which must be disclosed under NASD rules"), and there was minimal risk of confusion because [the expert's] testimony in respect of an "ultimate question" before the jury could have been properly limited by the District Court.
>
> If we were to conclude otherwise, Litvak would be put in an untenable position whereby he could not introduce testimony that either (1) the specific statements at issue in the case would not be important to a reasonable investor (due to "ultimate issue" concerns) or (2) the types of statements at issue are generally not important to a reasonable investor. *Litvak would be left only with the "victims" of his conduct as sources of potential testimony on this issue, an odd limitation where the jury is to evaluate materiality in an objective manner. See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013) ("[M]ateriality is judged according to an objective standard . . . .").

*Litvak*, 808 F.3d at 183-84 (emphasis added).

Precisely so, here. If Mizrach's testimony is excluded, the government would offer testimony from "victim investors" that the defendants' alleged LP representations "were important to them," while Karony would be barred from putting forth rebutting evidence that would allow the jury to "evaluate materiality in an *objective* manner," *Litvak*, 808 F.3d at 184 (emphasis added)— i.e., through Mizrach's testimony demonstrating the circumstances in which every SafeMoon user possessed instant access to accurate information bearing on the allegedly material misrepresentations at issue.

Moreover, since materiality "is judged according to an objective standard," *Amgen Inc.*, 133 S. Ct. at 1191, Mizrach's event-study testimony should not be excluded, as it elucidates the entire market's reaction to LP-related representations—signaling through market price the importance

7

users place on that information—as contrasted with the subjective judgments of arbitrarily selected investors.[4] Courts routinely admit expert testimony based on event studies examining the materiality issue in securities cases. *E.g.*, *United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014) ("Expert testimony concerning materiality often takes the form of an 'event study' . . . that examines the effect of an event on some dependent variable, such as a corporation's stock price"); *SEC v. Aly*, 16-cv-3853-PGG, 2018 U.S. Dist. LEXIS 51596, at *39 (S.D.N.Y. Mar. 27, 2018) (Event studies "constitute 'a well-established method for calculating the effect of an event on stock prices,' and are 'an accepted method for evaluating materiality.'") (quoting 26A Michael J. Kaufman, *Securtities Litigation Damages*, § 25B:1 (2017));  *United States v. Hatfield*, No. 06 Cr. 0550 (JS) (AKT), 2014 U.S. Dist. LEXIS 174947, 2014 WL 7271616, at *3 (E.D.N.Y. Dec. 18, 2014) ("Properly conducted event studies are widely accepted by courts in this Circuit.").  The government does not challenge Mizrach's event study methodology and any such argument is now forfeited.  In a recent status conference, the Court itself appeared to agree that an event study may be admitted on the question of materiality.

The government's sole attempt to distinguish *Litvak* claims that "[i]nstead of rigorously identifying the characteristics and abilities of the reasonable SFM investor, it appears that Mizrach simply substitutes his sophisticated understanding of traditional financial markets, blockchain tracing, smart contracts, and digital asset market transactions." Gov't Mot., p. 6.  Nothing could

---

[4] Event study methodology is employed by financial economists as a tool to measure and predict the effect on market prices from all types of new information relevant to a company's stock valuation. See John M. Bizjak & Jeffrey L. Coles, *The Effect of Private Antitrust Litigation on the Stock Market Valuation of the Firm*, 85 Am. Econ. Rev. 436 (1995); Michael I. Muoghalu et al., *Hazardous Waste Lawsuits, Stockholder Returns, and Deterrence,* 57 S. Econ. J. 357 (1990); David Prince & Paul Rubin, *The Effects of Product Liability Litigation on the Value of Firms,* 4 Am. L. & Econ. Rev. 44 (2002); W.K. Viscusi & J. Hersch, *The Market Response to Product Safety Litigation*, 2 J. Reg. Econ. 215 (1990).

more clearly demonstrate the government's failure to carefully review Mizrach's report. Far from substituting "his sophisticated understanding," Mizrach's analysis simply walks the fact finder through public information available to every SafeMoon user and draws rational inferences from it. Mizrach Discl., pp. 3-15. In fact, the government alleges that SafeMoon users were made aware of the defendants' allegedly false LP representations precisely because an ordinary user undertook the same diligence as Mizrach on the blockchain and Tweeted about it. Ind., ¶ 50. Indeed, when Karony requested that the government produce SafeMoon trading data to the defense to incorporate it into Mizrach's analysis, the government demurred on the ground that such information was already publicly available to the defense on the blockchain.

Finally, the government's characterization of cherry-picked lines from Mizrach's disclosure as "*ipse dixit*" is misplaced:

- "'Based on my experience with multiple blockchains, I believe that blockchain users regard these so-called 'white papers' as blueprints, and they understand that in practice, the functions of the blockchain may differ from the blueprint.'" Gov't Mot., p. 5 (quoting Mizrach Discl. 13). This is uncontroversial expert testimony regarding industry customs and practices. Exclusion of this opinion would be no less erroneous than the exclusion of virtually identical customs-and-practices testimony in *Litvak*. 808 F.3d at 183-84;

- "'automatic, public disclosures are one reason why participants use the blockchain in the first place.'" Gov't Mot., p. 5 (quoting Mizrach Discl.7). This is not Mizrach's say-so but an empirical observation based on the unchallenged experience of an expert in the field;

- "'The [SFM] investors were, in my view, rightly eager to have more trading opportunities off the block chain.'" Gov't Mot., p. 5 (quoting Mizrach Discl. 12). Again, this is an empirical observation based on an expert's experience;

- "'[A] reasonable investor would pay attention to the actions of the public Deployer address that created the SafeMoon token.'" Gov't Mot., p. 5 (quoting Mizrach Discl. 13). This is simply a summary of the preceding dozen pages of analysis and amounts to nothing more than an opinion that a user conscious of his investment could take objective steps to protect it in the manner outlined by Mizrach.

In any event, the integrity of Mizrach's opinions does not stand or fall on these four

9

statements drawn from the 15-page report, nor does the government argue otherwise.

### III.    Mizrach does not "import civil fraud standards" into his opinions

The government asserts that Mizrach's opinions are a "way to import civil fraud standards that have no application in a criminal fraud case." Gov't Mot., p. 8. Specifically, the government contends that his testimony represents an effort to require the government to prove "justifiable reliance," a securities fraud concept in civil cases. *Id.*, p. 9. As the government knows, it conflates justifiable reliance with the element of materiality.

"'Materiality' is the same in both the civil and criminal context." *United States v. Carroll*, 19-cr-545-CM, 202 U.S. Dist. LEXIS 65346, at *10 (S.D.N.Y. Apr. 14, 2020); *United States v. Gleason*, 616 F.2d 2, 28 (2d Cir. 1979) ("It is also settled that the same [materiality] standards apply to civil and criminal liability under the securities law."). As explained above, "materiality is judged according to an objective standard," *Amgen Inc.*, 133 S. Ct. at 1191, that asks whether trading information would be important to a "*reasonable* investor"—not *any* investor who testifies for the government. *Litvak*, 808 F.3d at 184 (emphasis original). Of course, if an expert's testimony outlining the objective information available to an investor constituted the improper importation of "justifiable reliance" into a criminal case, the Second Circuit would not have decided *Litvak* the way it did.

None of the government's cases is apposite. Gov't Mot., p. 9. The government cites *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) for the proposition that "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on *a defendant's criminal intent*. . ." (emphasis added). But Mizrach's opinions, of course, are not directed to Karony's intent but rather to materiality which asks whether a statement made by the defendant was materially misleading to a *reasonable* investor. Nor are those opinions premised on the claim that the government must show that "victims of the fraud were actually injured." *Weaver*, 860 F.3d at 95.

10

The government cites not a single case holding that a criminal defendant may not offer expert testimony on materiality addressing the circumstances informing the fact finder's assessment of the objective reasonable investor question. To the contrary, *Litvak* holds that such a ruling would be reversible error.

Moreover, the government ignores a key aspect of materiality under the securities laws. It is axiomatic that "where information is equally available to both parties, a defendant should not be held liable . . . under the securities laws for failure to disclose." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978). This principle is good law today. *E.g.*, *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (information contained in three newspaper articles sufficiently "in the public domain" to render it "not material"); *Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355-56 (S.D.N.Y. 2014) (same); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain . . . . a defendant may not be held liable for failing to disclose that information.").

Mizrach's opinions show that the LP information about which the defendants allegedly misled SafeMoon users was "equally available" to users on the blockchain. Mizrach Discl., pp. 3-15. It is no response to argue that this blockchain data was too obscure for some SafeMoon users to understand or retrieve, for the criterion is *equal access*, which Mizrach demonstrates users possessed. In any case, courts have found disclosures far more obscure than the blockchain to be in the public domain. *E.g.*, *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 255 (S.D.N.Y. 2019) (information published in technical journals in the Japanese language held to be in the public domain); *Bettis v. Se*, 16-cv-25-CM, 2016 U.S. Dist. LEXIS 180079, at *37-38 (S.D.N.Y. Dec. 20, 2016) (Chinese government's termination of state subsidies to LED companies in the public domain).

11

Finally, the government observes that "the Second Circuit and others have rejected the argument that disclaimers in investor contracts, whereby investors disclaim any reliance on oral or other extra-contract representations, render a defendant's false statements immaterial for purposes of the criminal fraud statutes." Gov't Mot., p. 10 (citing *Weaver*, 860 F.3d at 95). This argument miscarries for several reasons.

First, Mizrach's opinions do not rest on any principle of contract or disclaimer law or reliance. Second, the government has mispresented the point of law illustrated in *Weaver*. There, the court of appeals held that "contractual disclaimers of reliance on *prior* misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes." *Weaver*, 860 F.3d at 95 (emphasis added). Here, by contrast, Mizrach shows that the LP-related information allegedly withheld from SafeMoon users was in fact available to them the moment SafeMoon token was made available for acquisition on the blockchain. Thus, there is no "prior" misrepresentation at issue in this case. Mizrach Discl., pp. 3-15. Thirdly, even the *Weaver* court held that the contractual disclaimers there were "relevant to the jury's determination of Weaver's guilt." *Weaver*, 860 F.3d at 97. The court merely concluded that the disclaimers did not render Weaver not guilty *as a matter of law*. *Id*. Thus, even under the terms of the inapposite case offered by the government, Mizrach's opinions would be admissible.

In sum, Professor Mizrach's opinions do not "import civil fraud standards" into this case.

**IV.    Mizrach's testimony is not a "vehicle" for "self-serving hearsay"**

The government argues that Mizrach's references to Karony's out-of-court statements transform his opinions into an effort to smuggle into evidence Karony's "motive, knowledge, and intent." Gov't Mot., p. 10. That argument is perplexing.

First, the Court will notice that the government at once argues that Mizrach's opinions should be excluded because (1) they fail to sufficiently account for Karony's "numerous oral

12

representations to SFM investors," Gov't Mot., p. 7; and (2) they improperly take such statements into account. *Id.*, p. 10.  These positions are rather contradictory.

Second, hearsay is an out-of-court statement offered to prove the truth of the matter asserted.  Fed. R. Evid. 801(c)(2).  But, plainly, Mizrach's references to Karony's statements on Twitter about the SafeMoon LP are not for the purpose of proving the truth of those statements, nor do they go to Karony's "motive, knowledge, and intent."  Mizrach Discl., p. 12.  Instead, Mizrach's event study measures the impact of the defendant's statements—true or false—on the market price of SafeMoon token as one measure of their importance to users.  That is in the very nature of an event study.  Mizrach's testimony does not opine on the question whether Karony's statements are true, much less on Karony's mental state.  Mizrach Discl., p. 12.

Third, even if Mizrach's opinions turned on the truth of out-of-court statements made by Karony—which is not the case—"hearsay" is not a cognizable objection to an expert opinion if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject. . ." Fed. R. Evid. 703.  As explained, it is in the nature of an event study on the matter of materiality to measure the impact of defendant representations—out-of-court statements—on the market price of a security.  *E.g.*, *Martoma*, 993 F. Supp. 2d at 457.

Fourth, even if Mizrach's use of Karony's statements amounted to hearsay and even if Rule 703 somehow did not apply, statements concerning Karony's "motive and intent" (Gov't Mot., p. 10) fall under the hearsay exception created precisely for that evidentiary purpose.   Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) . . .").

For all these reasons, "hearsay" is not a valid basis to exclude Mizrach's testimony.

V. **Mizrach's opinions are based not on the indictment but on evidence**

The government faults Mizrach for referring to the government's allegations in the

13

indictment. Gov't Mot., p. 11. "It is well settled that the government's allegations are not evidence to be considered by the jury." *Id.*, p. 12.

Karony agrees that the indictment is not a source of accurate information, but the government misunderstands Mizrach's opinions. An expert's opinion must necessarily be situated within the framework of a case or controversy. The professor refers to allegations in the indictment to provide the context and background to the opinions he offers. But those opinions are not based on the government's allegations but rather the extensive body of evidence he collected and analyzed including LP token holder data, LP locking transaction data, SafeMoon and Binance token price data spanning March 5, 2021 to at least April 21, 2021, the defendants' public statements in March and April 2021, and other data. Mizrach Discl., pp. 3-12.

In conclusion, the government has not provided any basis under the rules to exclude the relevant and probative testimony of Professor Mizrach. Doing so would constitute a prejudicial trial error.

Dated: Nov. 21, 2024                    Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com


*Counsel for John Karony*

**Certificate of Service**

I hereby certify that on the 21st day of November, 2024, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com